**US MAGNESIUM LLC, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Tianjin Magnesium International Co., Ltd., Defendant–Intervenor.**

**Slip Op. 15–47.**
**Court No. 12–00006.**

United States Court of
International Trade.

May 21, 2015.

Jeffery B. Denning, King & Spalding LLP, of Washington, D.C., argued for plaintiff. With him on the brief was Stephen A. Jones.

Eric E. Laufgraben, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. With him on the brief were Stuart F. Delery, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Melissa M. Brewer, Attorney–International, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

David A. Riggle, Riggle & Craven, of Chicago, IL, argued for defendant-intervenor. With him on the brief was David J. Craven.

## OPINION

EATON, Judge:

Before the court are the final results of redetermination pursuant to court remand, dated July 11, 2013, of the administrative review of the antidumping duty order on pure magnesium from the People's Republic of China ("PRC") for the period of review May 1, 2009 through April 30, 2010 ("POR"). *See* Final Results of Redetermination Pursuant to Ct. Remand at 3 (ECF Dkt. No. 86–1) ("Remand Results"); *US Magnesium LLC v. United States,* 37 CIT ——, 895 F.Supp.2d 1319 (2013) (Tsoucalas, J.) ("*USM I* "); *see also* Pure Magnesium From the PRC, 76 Fed.Reg. 76,945 (Dep't of Commerce Dec. 9, 2011) (final results of the 2009–2010 antidumping duty administrative review of the antidumping duty order), and accompanying Issues and Decision Memorandum, PD 28 (Part 2), ECF Dkt. No. 25 ("Issues & Dec. Mem.") (collectively, the "Final Results"); Pure Magnesium From the PRC, the Russian Federation and Ukraine, 60 Fed.Reg. 25,691 (Dep't of Commerce May 12, 1995) (notice of antidumping duty orders). For the reasons set forth below, the Department of Commerce's ("Commerce" or the "Department") Remand Results are sustained.

## BACKGROUND

Defendant-intervenor Tianjin Magnesium International Co., Ltd. ("Tianjin") is an importer of pure magnesium supplied by its sole producer, Company A.[1] On January 18, 2012, plaintiff U.S. Magnesium LLC ("USM"), a domestic producer of pure magnesium, commenced this action, challenging several determinations made by the Department in the Final Results. Compl. (ECF Dkt. No. 9). The challenged determinations were made in the Final Results as part of the Department's factors of production ("FOP") methodology for calculating normal value. First, Commerce characterized the retorts used in Company A's manufacturing process as an indirect material input and treated expenses associated with the retorts as part of factory overhead. Issues & Dec. Mem. at 8. In making that finding, Commerce rejected, as untimely, information submitted by USM (the "untimely submission") that it claimed provided *prima facie* evidence that Tianjin had submitted fraudulent information regarding whether Company A rented retorts, rather than self-

---

**1.** [[*Confidential Data Deleted* ]] identity is being withheld as business-proprietary information. All references to this company hereinafter will be to "Company A."

produced them. *See* Mem. from Eve Wang, Case Analyst, to The File at 2, PD 11 (Part 2) (Sept. 20, 2011), ECF Dkt. No. 25 ("Submission Rejection Mem."). Second, Commerce selected the surrogate values used to calculate financial ratios, labor rates, and truck freight based on (1) Hindalco Industry Limited's ("Hindalco")[2] 2009–2010 audited financial statements, (2) data from the 2007–2008 Indian Annual Survey of Industries[3] ("ASI"), and (3) Infobanc[4] data, respectively. Issues & Dec. Mem. at 6, 11, 18.

The *USM I* Court (1) remanded the issue of USM's untimely submission and instructed the Department to consider whether it should be placed on the record, (2) deferred considering the issue of whether the retorts were properly treated as an indirect material input and valued as factory overhead, or whether the Department should have treated the retorts as a direct material input, "in order to allow Commerce to revisit its [characterization] ... in light of its decision concerning USM's untimely submission," and (3) held that the Department's selection of the sur-

rogate for truck freight was unclear and remanded for the Department to "explain its rationale ... or select a new surrogate for truck freight rates." *See USM I*, 37 CIT at ——, 895 F.Supp.2d at 1326, 1327, 1330 (citation omitted). The *USM I* Court also granted the Department's request for a voluntary remand regarding the surrogate values for financial ratios and labor rates. *See id.* at ——, 895 F.Supp.2d at 1330, 1331.

On remand, the Department continued to treat retorts as an indirect material input covered by the value of overhead expenses, found no evidence of fraud by Tianjin based on evidence contained in USM's untimely submission, used World Bank[5] data to calculate the surrogate value for truck freight, relied on the 2006–2007 financial statements of aluminum producer Madras Aluminium Limited Company ("MALCO") as the basis for calculating the financial ratios, and made an adjustment to its labor rate calculation. Remand Results at 2, 3, 21, 30, 31. These changes resulted in a 51.26 percent margin for Tianjin.[6] Remand Results at 3.

---

2. Hindalco is a producer of aluminum and copper and part of the Aditya Birla Group. *See* Letter from David A. Riggle, Riggle & Craven, to Gary Locke, Secretary of Commerce at 844, 846, PD 30 (Part 1) (Dec. 7, 2010), ECF Dkt. No. 25.

3. The Annual Survey of Industries is a public source of industrial statistics in India, set up and conducted pursuant to statute. *See Annual Survey of Industries (ASI)*, MINISTRY OF STATISTICS & PROGRAMME IMPLEMENTATION, GOV'T OF INDIA, http://mospi.nic.in/mospi_new/upload/asi/ASI_main.htm?status=1&menu_id=88 (last visited May 6, 2015).

4. Infobanc (Infobanc.com) is a business-to-business website (or portal) that provides customer and market research databases, a "network of international buyers," and other services to businesses. *See Frequently Asked Questions*, INFOBANC, http://help.infobanc.com (last visited May 5, 2015).

5. The World Bank collected the data used to calculate the surrogate value for truck freight "as part of the Doing Business project, which measures and compares regulations relevant to the life cycle of a small- to medium-sized domestic business in 183 economies." *See* Letter from Jeffery B. Denning, King & Spalding LLP, to Hon. Gary Locke, Secretary of Commerce at 300, PD 29 (Part 1) (Dec. 7, 2010), ECF Dkt. No. 25 ("USM's Surrogate Value Submission"). In doing so, World Bank sent its *Trading Across Borders Questionnaire* to companies in India and "[l]ocal freight forwarders, shipping lines, customs brokers, port officials and banks provide[d] information on ... cost...." *See* USM's Surrogate Value Submission at 304, 355.

6. In the Final Results, Commerce had calculated a 0.00 percent margin for Tianjin. Pure Magnesium From the PRC, 76 Fed.Reg. at 76,947.

## STANDARD OF REVIEW

■ "The court shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed for compliance with the court's remand order." *Yantai Xinke Steel Structure Co. v. United States,* 38 CIT ——, ——, Slip Op. 14–38, at 4, 2014 WL 1387529 (2014) (quoting *Xinjiamei Furniture (Zhangzhou) Co. v. United States,* 38 CIT ——, ——, Slip Op. 14–17, at 3, 968 F.Supp.2d 1255, 2014 WL 594073 (2014)) (internal quotation marks omitted).

## DISCUSSION

### I. LEGAL FRAMEWORK

■ "The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value." *Jacobi Carbons AB v. United States,* 38 CIT ——, ——, 992 F.Supp.2d 1360, 1365 (2014) (quoting *Clearon Corp. v. United States,* 37 CIT ——, ——, Slip Op. 13–22, at 4, 2013 WL 646390 (2013)) (internal quotation marks omitted). When making the fair value determination, Commerce is required to make "a fair comparison ... between the export price [7] or constructed export price [8] and normal value." *See* 19 U.S.C. § 1677b(a).

■ Ordinarily, in a case such as this where the subject merchandise is exported from a nonmarket economy country,[9] "the normal value of the subject merchandise [is determined based on] the value of the factors of production utilized in producing the merchandise and [an] added ... amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *See id.* § 1677b(c)(1). By statute, to find these surrogate values, Commerce is directed to use, "to the extent possible, the prices or costs of factors of production in one or more market economy countries that are ... at a level of economic development comparable to that of the nonmarket economy country[ ] and ... significant producers of comparable

---

7. "Export price" is defined as

 the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States.

 19 U.S.C. § 1677a(a).

8. "Constructed export price" is defined as

 the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter.

 19 U.S.C. § 1677a(b).

9. A "nonmarket economy country" is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). "Because the Department deems the PRC 'to be a nonmarket economy country, Commerce generally considers information on sales in [the PRC] and financial information obtained from Chinese producers to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise.'" *Jacobi Carbons,* 38 CIT at —— n. 11, 992 F.Supp.2d at 1365 n. 11 (alteration in original) (quoting *Shanghai Foreign Trade Enters. Co. v. United States,* 28 CIT 480, 481, 318 F.Supp.2d 1339, 1341 (2004)). "Accordingly, Commerce invokes a different statutory procedure for determining normal value if the subject merchandise is exported from a nonmarket economy country." *Shanghai Foreign Trade Enters.,* 28 CIT at 481, 318 F.Supp.2d at 1341.

merchandise." *Id.* § 1677b(c)(4). When valuing factors of production, Commerce must use "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the [Department]." *Id.* § 1677b(c)(1). In selecting the best available information, Commerce's practice "is to 'choose surrogate values that represent broad market-average prices, prices specific to the input, prices that are net of taxes and import duties, prices that are contemporaneous with the POR, and publicly available non-aberrational data from a single surrogate market-economy.'" *Jacobi Carbons,* 38 CIT at ——, 992 F.Supp.2d at 1366 (quoting *Clearon,* 37 CIT at ——, Slip Op. 13–22, at 7) (citing 19 C.F.R. § 351.408(c)(2)). Thus, to determine normal value of subject merchandise exported from a nonmarket economy country, Commerce first must "assess the 'price or costs' of factors of production of [the product at issue] in [a surrogate market economy country] in an attempt to construct a hypothetical market value of that product in [the nonmarket economy country]." *See Nation Ford Chem. Co. v. United States,* 166 F.3d 1373, 1375 (Fed. Cir.1999).

█ As to financial ratios, "[i]n nonmarket economy antidumping cases, such as this, in selecting financial statements to calculate the financial ratios used to determine an exporter's dumping margin, 'Commerce looks to specificity, contemporaneity, and quality of the data.'" *Yantai,* 38 CIT at ——, Slip Op. 14–38, at 23 (quoting *Dongguan Sunrise Furniture Co. v. United States,* 37 CIT ——, ——, 904 F.Supp.2d 1359, 1366 (2013)).

## II. LABOR RATE ADJUSTMENT

█ In the Remand Results, Commerce made two corrections to the surrogate value for labor. *See* Remand Results at 3, 21 ("The Department agrees with USM that it erred when inflating the labor rate with respect to the base period and used the incorrect index to adjust for inflation in the *Final Results.* Accordingly, the Department ... corrected those two errors for [the] draft results of redetermination."). First, the Department corrected the base period it had used to adjust for inflation by changing the period from May 1, 2007 through April 30, 2008 to a period contemporaneous with that of the data itself, April 1, 2007 through March 31, 2008. *See* Remand Results at 21. Second, Commerce selected "the consumer price index typically used to adjust for inflation in accordance with the Department's labor policy bulletin," rather than the wholesale price index from India that Commerce had used in the Final Results. *See* Remand Results at 21.

Because Commerce was reasonable in choosing a time period more contemporaneous with the data and used the consumer price index in accordance with its past practice, and because neither USM nor Tianjin challenge the adjustment, it is sustained.

## III. USM'S ARGUMENTS

### A. Characterization of Retorts as Factory Overhead

USM objects to the Department's characterization of the retorts, used in the production of pure magnesium, as an indirect input, valued as part of factory overhead, rather than a direct input.

"Retorts" are steel tubes used during the purification process of magnesium. Tianjin "imports pure magnesium supplied by a sole producer," Company A, which "produces pure magnesium via the 'Pidgeon' process." *USM I,* 37 CIT at ——, 895 F.Supp.2d at 1322 (citation omitted). To produce pure magnesium using this process, Company A "first treats magnesium-bearing dolomite in a kiln to produce calcined dolomite." *Id.* Next, the calcined

dolomite is mixed with ferrosilicon and fluorite powder. *Id.* Company A then "presses the mixture into balls or briquettes" and,

> [i]n order to ... chemically and physically separate [the magnesium] from the other inputs[,] ... places the pressed mixture into retorts, which are "steel tubes placed under a vacuum in a furnace." The high heat from the furnace vaporizes the magnesium, which travels through the retort and then "condense[s] into a highly purified form."

*Id.* (alteration in original) (quoting Def.'s Opp'n to Pl.'s Mot. for J. upon the Agency R. 5 (ECF Dkt. No. 41)) (citing Issues & Dec. Mem. at 7 n. 39).

■ The court finds that a review of the steps the Department took, the evidence it considered, and its past practice, demonstrate that the decision to treat the retorts as overhead rather than a direct material was based on substantial evidence and is in accordance with law. Thus, for the following reasons, the Department's characterization of retorts as overhead is sustained.

To begin with, in the Final Results, the Department noted that "[i]ndirect materials are usually: (1) items used in the production process, but not traceable to a particular product; *or* (2) items that are added directly to products, but whose cost is so small that the effort of tracing that cost to individual products would be greater than the benefit of accuracy." Issues & Dec. Mem. at 8 (emphasis added). Here, the Department found that the retorts "are not physically incorporated into the final product and are replaced too infrequently to be a direct material." *See* Issues & Dec. Mem. at 8; Remand Results at 30. In support of these conclusions, the Department noted that there was no record evidence "that the retorts are traceable to specific magnesium products [and USM] conceded that [the] retorts are not physically incorporated into the final prod-

uct." *See* Issues & Dec. Mem. at 9. Instead, according to Commerce, the record indicated that the "retorts are steel tubes inside furnaces[,] ... where [precursor materials] react to form magnesium vapors which are then condensed and later re-melted into ingots." *See* Issues & Dec. Mem. at 9. Indeed, there is no real dispute that the retorts are not physically incorporated into the pure magnesium product.

With regard to cost, USM suggests that the cost of retorts supports a finding that they are a direct material input and argues that "Commerce ... improperly determined that retorts are an indirect material based on a finding that the associated 'cost is so small that the effort of tracing the cost[ ] to individual products would be greater than the benefit of ... accuracy.' " U.S. Magnesium's Comments Concerning Commerce's Redetermination Pursuant to Remand 38 (ECF Dkt. No. 94) ("Pl.'s Br.") (quoting Remand Results at 14). USM, however, misconstrues the Department's point. In the Remand Results, Commerce stated that "[u]nder the Department's practice, indirect materials are usually items used in the production process, but are not traceable to a particular product, *or* items that are added directly to products, but whose cost is so small that the effort of tracing that cost to individual products would be greater than the benefit of accuracy." Remand Results at 14 (emphasis added). The Department, however, only made reference to a small cost as being an indication that an input was an indirect material in order to give a complete statement of its rule, not as a finding of fact. Commerce's finding of fact was that the retorts were an indirect material because they were not incorporated into the resulting magnesium, not because their cost was small. USM's argument, thus, is without merit.

Also, in the Final Results, from which Commerce did not depart in the Remand

Results, the Department determined that the evidence USM placed on the record during the investigation in an attempt to demonstrate that the retorts were considered a direct material input by the magnesium industry was inconclusive. *See* Issues & Dec. Mem. at 9; Remand Results at 30. In particular, it first found financial reports from a ten-year-defunct company, Southern Magnesium & Chemicals Ltd., to be speculative and unpersuasive. *See* Issues & Dec. Mem. at 9 ("First, [USM] provided non-contemporaneous financial statements for this company covering the fiscal years 1994–1995 through 2000–2001. None of these financial statements, except [those for] 1994–1995[,] . . . list retorts as a direct material.").

Next, "[w]ith regard to [USM's] claim that a Malaysian producer treated retorts as 'raw materials,' the Department [found] that an individual company's treatment [was] insufficient to show that the magnesium industry as a whole treats retorts as [a] direct material when most of the other industry financial statements available on the record . . . did not list retorts as direct material." Issues & Dec. Mem. at 9. Accordingly, it is difficult to quarrel with the Department's conclusion that USM has presented little evidence that retorts are treated as a direct material input by the magnesium industry.

USM next asserts that record evidence demonstrates that Company A treated retorts as a direct input on its financials. *See* Pl.'s Br. 29, 30. The primary evidence relied upon by USM is a subledger, on which the retorts are described as "materials consumption." *See* Pl.'s Br. 29 (quoting Ex. SD–6A to Pl.'s Br. (ECF Dkt. No.

94) ("Subledger")) (internal quotation marks omitted); *see also* Remand Results at 30. The Department, however, notes that the subledger also (1) included "items that would not be considered direct material inputs" as "material[s] consumption" [10] and (2) includes "other line-items that are not material inputs." [11] *See* Remand Results at 30–31 (quoting Mem. from Eve Wang, International Trade Compliance Analyst, to The File at 3, PD 29 (Part 2) (Dec. 5, 2011), ECF Dkt. No. 25) (internal quotation marks omitted). Thus, although, at first blush, the description "materials consumption" might indicate that the listed items were direct inputs, an examination of the nature of the entries shows that they are not. As a result, Commerce determined that, despite Company A having listed retorts as "materials consumption," the subledger does not indicate that Company A treated retorts as a direct material. *See* Remand Results at 30–31.

In addition, because Company A's "December 2009 monthly production cost sheet" does not include retorts under the category of "raw material" along with other direct materials such as dolomite and flux, Commerce concluded that the cost sheet was further evidence that Company A did not treat retorts as a direct material. *See* Remand Results at 31·n. 113 ("None of the evidence presented by USM undermines the Department's original determination with respect to retorts. Record evidence demonstrates that [Tianjin's] producer [ (Company A) ] does not treat retorts as raw material on its books and records. [Company A's] December 2009 monthly production cost sheet, under the category of 'raw material,' *i.e.,* direct materials, lists (1) Fesi; (2) Dolomite; (3) Flux;

---

10. The subledger also lists items such as [[*Confidential Data Deleted*]] and [[*Confidential Data Deleted*]], and [[*Confidential Data Deleted*]] is also described as "materials consumption." *See* Subledger.

11. The subledger also lists non-material inputs such as [[*Confidential Data Deleted*]]. *See* Subledger.

(4) Fluorite Powder; (5) Sulphur Powder; and (6) Sulfuric Acid, and does not include retorts." (quoting Letter from David A. Riggle, Riggle & Craven, to Secretary of Commerce at 113 (Ex. D–2h), CD 3 (Part 1) (Aug. 27, 2010), ECF Dkt. No. 25)). The foregoing demonstrates that the Department's conclusion, that Company A did not treat retorts as a direct material, is supported by substantial evidence.

Aside from the evidence itself, USM also makes a claim with respect to Commerce's current practice by arguing "that physical incorporation [is] no longer ... *required* for a finding that an item is a direct material." Pl.'s Br. 37. According to USM, Commerce is "exclusively following its 1998 decision [12] that rested only on that factor," physical incorporation, which is no longer its practice, and, thus, "Commerce has in effect reverted to its old practice without accurately explaining its reasons for doing so." Pl.'s Br. 37 (citing Remand Results at 8). For USM, "Commerce must consider all record evidence relevant to analysis of this issue" and "[i]t has not done so." Pl.'s Br. 38.

USM asserts that the following statement in a supplemental questionnaire issued to Tianjin indicates that Commerce no longer requires physical incorporation to make a finding that an item is a direct material input:

[Tianjin] reported retort vessels as part of overhead and did not report per-unit FOP consumption of the material.... In addition, the Department has included as direct material inputs that are essential to production and used in significant quantities, *despite*[13] *such inputs not being physically incorporated into the final product.*

*See* Pl.'s Br. 16 (alteration in original) (quoting Letter from Eugene Degnan, Program Manager, to David A. Riggle, Riggle & Craven at 4, PD 40 (Part 1) (Jan. 18, 2011), ECF Dkt. No. 25).

The Department maintains, though, that physical incorporation is still an important factor that it permissibly considered in making its determination. *See* Remand Results at 31 ("Lastly, as to USM's assertion that the draft remand results failed to acknowledge that the basis for the 1998 [characterization] of retorts, based on physical incorporation, is no longer the Department's policy, we disagree. Although USM points to a supplemental questionnaire to argue that 'physical incorporation is no longer required for finding an item to be an indirect material,' this does not demonstrate that the Department does not consider physical incorporation in its analysis. Indeed, as explained above, the CIT [14] recently upheld the Depart-

---

12. In the new shipper review to which USM refers, Commerce declined to treat retorts as a direct material because they were not physically incorporated into the final product. *See* Pl.'s Br. 17 n. 24 (citing Pure Magnesium From the PRC, 63 Fed.Reg. 3,085, 3,088 (Dep't of Commerce Jan. 21, 1998) (final results of antidumping duty new shipper administrative review)). This new shipper review tends to support the conclusion that the Department has a past practice of finding physical incorporation to be important in a determination of how to characterize an input.

13. The presence of the word "despite," of course, undermines USM's argument.

14. In *Bridgestone Americas v. United States*, the input at issue, HO Oil was "added in [the] milling process, for the purposes of softening rubber and improving its processing technical function." *Bridgestone Americas, Inc. v. United States*, 34 CIT ——, ——, 710 F.Supp.2d 1359, 1364 (2010) (alteration in original) (citation omitted) (internal quotation marks omitted). The *Bridgestone Americas* Court held that Commerce's finding, that the oil was a direct input, was supported by substantial evidence and in accordance with law because "[i]n ordinary parlance this description characterizes an input that is physically incorporated into the finished product." *Id.*

ment's decision in which it considered physical incorporation whether looking at the direct versus indirect material analysis." (citation omitted)). It is apparent that the question, from the Department's supplemental questionnaire, to which USM points was designed to elicit other information that might be relevant to the issue of whether the retorts should be characterized as a direct input, not a signal that it was abandoning its physical incorporation analysis.

Commerce is thus right in its claim that treating the retorts as an indirect material is consistent with its past practice of characterizing materials as overhead when "they are not physically incorporated into the final product and are replaced too infrequently to be a direct material." *See* Issues & Dec. Mem. at 8. In the Issues and Decision Memorandum, Commerce pointed to its prior determinations regarding copper wire incorporated into cans used to preserve mushrooms and two kinds of molds—graphite and steel—used in the production of diamond sawblades. Commerce stated that,

> [u]nlike the copper wire in *Mushrooms/PRC AD Final* (09/14/2005) (where copper wire became part of the can covered by the scope of the order) or graphite molds in *Diamond Sawblades/PRC AD Final* (05/22/2006) (where a portion of the graphite mold[ ] was absorbed into the finished segment), retorts in this review are not consumed and incorporated into the final product. Furthermore, [in *Diamond Sawblades/PRC AD Final* (05/22/2006),] the Department found that graphite molds

were replaced regularly enough to represent a direct material rather than overhead. In *Diamond Sawblades/PRC AD Final* (05/22/2006), the producer used both graphite and steel molds to produce the final product and the Department reached different conclusions as to whether each kind of mold was a direct material. While the Department found graphite molds to be a direct material, it found steel molds to be overhead. In addition to considering the fact that steel molds were not absorbed into the final product, the Department reasoned that steel molds were replaced less frequently than graphite molds. Thus, ... the Department finds that retorts are more like steel molds and are considered overhead, than graphite molds, because retorts are not consumed into the final product [15] and are replaced too infrequently [16] to be a direct material.

Issues & Dec. Mem. at 8 (footnotes omitted) (citing Certain Preserved Mushrooms From the PRC, 70 Fed.Reg. 54,361 (Dep't of Commerce Sept. 14, 2005) (final results and final rescission, in part, of antidumping duty administrative review), and accompanying Issues and Decision Memorandum at comment 15; Diamond Sawblades and Parts Thereof from the PRC, 71 Fed.Reg. 29,303 (Dep't of Commerce May 22, 2006) (final determination of sales at less than fair value and final partial affirmative determination of critical circumstances), and accompanying Issues and Decision Memorandum at comment 2). In addition, Commerce is

---

**15.** Because there was no record evidence "that the retorts are traceable to specific magnesium products [and USM] conceded that [the] retorts are not physically incorporated into the final product," it was reasonable for Commerce to conclude that retorts are not physically incorporated into the pure magne-

sium produced by Company A. Issues & Dec. Mem. at 9.

**16.** Company A replaces its retorts every [[*Confidential Data Deleted*]]. *See* Mem. from Eve Wang, International Trade Compliance Analyst, to The File at 3 n. 9, CD 6 (Part 2) (Dec. 5, 2011), ECF Dkt. No. 25.

correct that this analysis demonstrates both (1) that the Department continues to consider physical incorporation when making a determination as to whether an input is a direct material or not and (2) how this consideration is used in its analysis.

The Department's thorough review of USM's claims demonstrates that they are without merit. Therefore, the Department's determination to treat retorts as an indirect material valued as overhead is sustained as being supported by substantial evidence and in accordance with law.

## B. The Untimely Submission

Almost eleven months after the deadline, USM filed a submission of publicly available information regarding retorts, including (1) an August 26, 2011 Chinese magnesium industry bulletin, (2) "the website of an entity that [USM] claims is the producer of the subject magnesium[,] and [ (3) ] an excerpt from a May 2006 Chinese Magnesium Industry Directory published by the Chinese Magnesium Association." [17] *See* Submission Rejection Mem. at 2; *see also USM I*, 37 CIT at ——, 895

F.Supp.2d at 1323. USM insists that the submission, along with other record evidence, shows (1) that Company A is the same entity as (or is very closely aligned with) Company B,[18] another manufacturer of magnesium, (2) that Company B was a producer of retorts, and (3) that Company A therefore produced, rather than rented, the retorts it used to make the subject merchandise that it supplied to Tianjin. *See* Submission Rejection Mem. at 2; Pl.'s Br. 13, 14. According to USM, Tianjin was required to disclose to the Department that Company B, and thus Company A, produced retorts and "[i]ts failure to do so ... is strong evidence that fraud occurred in the underlying review." *See* Pl.'s Br. 15. Moreover, according to USM, this evidence is significant because a finding of fraud on the part of Tianjin would permit the Department to apply adverse facts available [19] ("AFA") to Tianjin's submissions regarding the retorts. *See* Pl.'s Br. 16, 21. The Department rejected the submission as untimely and, thus, did not consider the factual information found in the rejected documents in the Final Re-

---

**17.** USM claimed in its Rule 56.2 brief that the "Chinese industry bulletin conclusively establish[ed] that [Company A] produced the estimated [[*Confidential Data Deleted*]] retorts it is estimated to have consumed at one of its two magnesium factories during the POR" and that the website and directory corroborated the information in the bulletin. *See* U.S. Magnesium's Rule 56.2 Br. in Supp. of Mot. for J. on the Agency R. 7, 8 (ECF Dkt. No. 32) ("USM's 56.2 Br.") (citing Submission Rejection Mem. at 2). According to USM, because Tianjin "had failed to report this fact and instead claimed that [Company A] rented retorts," and because this "information was dispositive of a crucial issue" (the characterization of retorts as direct or indirect material inputs), "the [ (untimely) ] submission demonstrated that [Tianjin] had concealed material facts in an effort to reduce its margins." USM's 56.2 Br. 7–8. Before the court, USM does not appear to make any

specific arguments related to the documents in its untimely submission. USM does, however, continue to argue against Commerce's general position that the documents do not pertain to Company A or show that Company A produced the retorts it used to manufacture pure magnesium. *See* Pl.'s Br. 14.

**18.** [[*Confidential Data Deleted*]] identity is being withheld as business-proprietary information. All references to this company hereinafter will be to "Company B."

**19.** Pursuant to 19 U.S.C. § 1677e(b), if Commerce "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from the [Department]," Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).

sults. *See* Submission Rejection Mem. at 2.

The *USM I* Court remanded the issue of USM's untimely submission, instructing the Department to consider whether the untimely submission should be placed on the record. *See USM I,* 37 CIT at ——, 895 F.Supp.2d at 1326.

### 1. Whether Fraud Existed and the Strength of the Evidence of Fraud

■ Pursuant to the *USM I* Court's remand order, the Department opened the administrative record and accepted USM's untimely submission so that it could consider whether the documents provided *prima facie* evidence of fraud related to the relationship between Company A and Company B and whether Company A made or rented the retorts. *See* Remand Results at 2, 5. In the Remand Results, the Department determined that USM's submission did not demonstrate fraud on the part of Tianjin largely because the documents that made up the submission did not (1) contradict or undermine Tianjin's statement that Company A rented retorts or (2) demonstrate that Company A produced, rather than rented, retorts. *See* Remand Results at 24.

In reaching this determination, the Department found the USM evidence to be unconvincing and chose to rely on what, it believed, was more reliable information on the record. This evidence was the verification report from the 2007–2008 review and the fact of Company A's (rather than Company B's) control of the plants that produced the pure magnesium at issue. Based on this evidence, the Department determined that Company A and Company B were separate operations, headquartered in the same building.[20] *See* Remand Results at 24, 25, 26 (stating that, "even

though both the 2007–2008 and 2008–2009 verifications of the sales and accounting activities of [Company A] took place in [Company B's] headquarters, [Commerce] treated, and continue[s] to treat, them [as] separate[ ] legal entities," that the 2007–2008 verification report "clearly states that the companies are separate legal entities," and that, in the 2008–2009 and 2009–2010 reviews, "the two plants that produced the subject merchandise . . . continued to be in the sole control of [Company A]"). Therefore, for the reasons given by the Department, it found that the bulletin, website, and directory provided by USM, which show that Company B made retorts, did not demonstrate that Company A made retorts or that Tianjin provided inaccurate information to the Department regarding Company A.

The Department also rejected USM's suggestion that Tianjin's failure to disclose that Company A was affiliated with Company B constituted a failure to cooperate because the questionnaire sent to Tianjin did not require it to disclose that information. *See* Remand Results at 24, 27–28 ("Further, we disagree with USM that [Tianjin] failed its duty to report, or was even on notice of an obligation to report, the fact that its supplier [ (Company A) ] may have had an affiliate [ (Company B) ] that produces retorts. . . . [T]he . . . question directs [Tianjin], the respondent in this review, to report its affiliate producers. In response, [Tianjin] responded that [Company A] was its unaffiliated producer. However, the Department did not design this question to seek information regarding affiliates of non-affiliated producers[ (i.e., whether Company A was affiliated with Company B) ]. Whether a non-affiliate producer has other affiliates has

---

**20.** The Department also noted that neither the fax number nor address identified in the USM documents for Company B "matche[d] the fax number or address of [Company A] on the record." *See* Remand Results at 13.

no implication on the dumping margin calculation pertaining to the respondent if these affiliates are not involved in the production of the subject merchandise exported by [Tianjin], as in this review. Record evidence also shows that [Tianjin] has no affiliation with its supplier of subject merchandise, [Company A], in this review. Thus, contrary to USM's claim, [Tianjin] would· have no duty to report whether its non-affiliate supplier [Company A] had an affiliate that produced retorts." (footnotes omitted)).

The court sustains the Department's determination "that the documents submitted by USM do not demonstrate *prima facie* evidence of fraud by [Tianjin]." *See* Remand Results at 31.

First, Commerce considered the record evidence and reasonably determined that Company A and Company B were not the same company. *See* Remand Results at 24–25 ("The 2007–08 verification report explicitly states that [Company B] and [Company A] are 'separate legal entities,' and 'kept distinct financial records during the [period of review].' During that [period of review], 'beginning in January 2008, [a] pure magnesium plant was transferred to [Company A], at which point [Company A] became the sole producer of subject merchandise for the remainder of the [period of review].' The Department verified the relevant documents recording the ownership transfer from [Company B] to [Company A]. During the subsequent two reviews (*i.e.,* the 08–09 and 09–10 reviews), the two plants that produced the subject merchandise ... continued to be in the sole control of [Company A], and [Company B] was no longer [Tianjin's] supplier of pure magnesium for those reviews. No evidence on the record of this review contradicts these findings.... As explained in the draft remand results, even though both the 2007–2008 and 2008–2009 verifications of the sales and accounting activities of [Company A] took place in [Company B's] headquarters, we treated, and continue to treat, them to be separate[ ] legal entities." (footnotes omitted)).[21] In other words, the Department did not simply take Tianjin's word for the relationship between Company A and Company B; this relationship was a subject of verifications. Moreover, Tianjin had provided the Department with documentation showing that it rented its retorts and, in the Remand Results, the Department stated that it did "not find that the new record evidence demonstrates that [Company A] produced retorts rather than rented them." *See* Remand Results at 26, 29 ("In response to the Department's request for [Company A's] internal documentation prepar[ed] during the normal course of business indicating the retorts are treated as overhead, [Tianjin] provided a rental lease of retorts as well as excerpts of Chinese accounting literature showing that rent is treated as an indirect manufacturing expense in China.").

Second, the Department correctly rejected USM's argument that Commerce should apply AFA as a result of Tianjin's failure to submit information about Company B because the questionnaire sent to Tianjin did not require it to disclose information about unaffiliated companies that did not produce the subject magnesium. Indeed, Question 3.a of the questionnaire directed the respondent, here, Tianjin, to "[p]rovide an organization chart and description of [the] company's [ (Tianjin's) ] operating structure," to "[d]escribe the general organization of the company and each of its operating units," and "for all

---

**21.** Moreover, Commerce also found that USM's claim that Company A "[[*Confidential Data Deleted*]] finds no support on the record.... In fact, the second piece of evidence proffered by USM states that [[*Confidential Data Deleted*]] specifically refers to [Company B], not [Company A]." Remand Results at 25 (footnote omitted).

*affiliated producers of the merchandise under consideration,* [to] provide information for the following table." *See* Remand Results at 27 (emphasis added) (quoting Letter from Eugene Degnan, Acting Program Manager, to David A. Riggle, Riggle & Craven at A–5—A–6, PD 4 (Part 1) (June 30, 2010), ECF Dkt. No. 25). Although Company B may be affiliated with Company A, there is no indication that Tianjin was affiliated with Company A, let alone, Company B. As such, because Company B is not affiliated with Tianjin and is not itself a producer of the subject merchandise, Tianjin was not required to include information about Company B in its response to the questionnaire. Thus, Tianjin did not fail to disclose information about Company B, or Company A's relationship with Company B, because the questionnaire did not ask for that information.

Because Commerce reasonably determined that the record evidence does not show that the companies are so closely aligned that they should be considered one, and because Tianjin did not fail to disclose the information that Commerce asked for in its questionnaire, Commerce's finding that the documents do not provide evidence of fraud or warrant the application of AFA is supported by substantial evidence.

### 2. Level of Materiality

In addition to finding that the evidence did not support a finding that Company A made, rather than rented, the retorts, the Department found that, even if the reverse had been true, it would have been immaterial to its determination that the retorts were an indirect input. Pursuant to the *USM I* Court's instructions, Commerce considered the level of materiality of the information in USM's untimely submission, as well as USM's claim that Tianjin failed to disclose Company A's affiliation with Company B, and found "that this informa-

tion ha[d] no bearing on the [characterization] of retorts as overhead in this case" and was thus not material to its determination. *See* Remand Results at 15, 31. Put another way, the Department found and the court agrees that, even if the information contained in the untimely submission had shown that the relationship between Company A and Company B was so close that Company A could be considered a manufacturer rather than a lessee of retorts, it simply would not have mattered.

Although USM claims that Tianjin's "failure to provide complete disclosure of its supplier's business practices [ (i.e., USM's claim that Company A produced, rather than rented, retorts) ] with respect to retorts necessarily is material to the margin calculations," this is clearly not the case. *See* Pl.'s Br. 26. As Commerce indicated, whether an input is rented or produced does not affect the Department's analysis in characterizing the input as either a direct material input or an indirect material input valued as overhead. Remand Results at 14–15.

There can be no real question that Commerce was correct in its finding. As has been previously noted, the Department was reasonable in treating the retorts as overhead. Whether Company A rented or produced the retorts it used, however, had no · bearing on Commerce's characterization of the retorts or on its resulting margin calculation. Thus, Tianjin's rate would have been the same had it disclosed a close relationship between Company A and Company B or had Commerce found that Company A produced its retorts. Therefore, because the court has already sustained Commerce's characterization of the retorts as overhead, and because the manner in which Company A acquired the retorts had no impact on that characterization (or consequently, on Tianjin's rate), the Department's finding regarding materiality is sustained.

## IV. TIANJIN'S ARGUMENTS

Tianjin argues that the Remand Results should be returned to Commerce for the Department to consider the arguments made in its comments on the draft remand results with respect to the surrogate value for truck freight and to give it an opportunity to comment on the selection of the MALCO data as the basis for the financial ratios in the Remand Results.

### A. Selection of the World Bank Data to Calculate the Surrogate Value for Truck Freight

In the Final Results, Commerce acknowledged that it was unclear exactly what costs were covered by the Infobanc truck freight rate data, but nonetheless concluded that it was the best available information on the record and selected the data to calculate the surrogate value for truck freight. *See* Issues & Dec. Mem. at 16, 18. The *USM I* Court remanded this finding because it concluded that Commerce had "erred in failing to support its selection of Infobanc rates with substantial evidence and in ignoring contradictory evidence on the record." *USM I*, 37 CIT at ——, 895 F.Supp.2d at 1328.

Thus, on remand, Commerce was directed to "either adequately explain its rationale for selecting Infobanc data with support from substantial evidence in the record or select a new surrogate for truck freight rates." *Id.* at ——, 895 F.Supp.2d at 1330. In the Remand Results, the Department found that the World Bank data was the best available information, and used those rates to value inland truck freight, because it was "contemporaneous with the POR and based on country-wide

information," "[t]he World Bank provides information on the source and calculation of the rates it reports," and the World Bank submission included "a detailed discussion support[ing] how the World Bank data were determined." *See* Remand Results at 17. Commerce also found the World Bank publication to be "reliable because it provides detailed information about its local partners with whom it works to collect the necessary information for calculat[ing] its reported rates." Remand Results at 17.

While Tianjin asks for another remand so that Commerce might consider its argument, made in its comments on the draft remand results, that "[t]he World Bank data is aberrational and not representative of India's truck freight prices," it is apparent that the reason the Department did not address this argument is because Tianjin misfiled its comments.[22] *See* Comments of Def.-Int. Tianjin Magnesium International Co., Ltd. on the Department's Remand Determination of July 11, 2013 2 (ECF Dkt. No. 92) ("Tianjin's Br."); Public App. to Tianjin's Br. 2 (ECF Dkt. No. 95); Oral Arg. Tr. 31:24–32:10 (ECF Dkt. No. 115); *see also* Def.'s Reply to Comments Regarding Final Remand Results 22 (ECF Dkt. No. 106) ("Def.'s Br."). Because of this misfiling, Tianjin's comments concerning the calculation of truck freight were never entered on the record of the administrative proceeding and, as a result, the Department was unaware of them. *See* Remand Results at 2 ("[Tianjin] did not submit comments on the draft remand results."); *see also* Def.'s Br. 22–24.

Although it acknowledges that it selected the wrong period of review when electronically filing its comments,[23] Tianjin's

---

**22.** Tianjin misfiled its comments to Commerce on the draft remand results by selecting the incorrect period of review so that its comments were not electronically filed in the

correct location. *See* Oral Arg. Tr. 31:24–32:10 (ECF Dkt. No. 115).

**23.** At oral argument, Tianjin's counsel stated that in filing the comments, "one of the attor-

counsel nonetheless argues that "[t]o the extent the Department did not even consider [its] comments on the draft remand, such remand must be rejected and returned to the Department for consideration of [Tianjin's] timely filed comments." Tianjin's Br. 2; *see also* Oral Arg. Tr. 31:24–32:10. Notably, Tianjin's counsel gives no reason or explanation as to how their misfiled comments were "timely."

The court will not remand this case again because, first, Tianjin's counsel misfiled its client's comments, thus preventing the Department from considering them and thereby waiving its opportunity to be heard during the administrative process, and, second, in its arguments before the court,[24] Tianjin has not shown that the Department's selection of the World Bank data was somehow wrong.

 In its misfiled comments on the Department's draft remand results, which are attached to its brief before this court as an appendix, Tianjin's entire argument is that the World Bank data selected as a surrogate for truck freight is aberrationally high. *See* Public App. to Tianjin's Br. 2–3. Tianjin cites to no record evidence, however, that this is the case.

Moreover, because Commerce demonstrated in the Remand Results that the World Bank data is "contemporaneous with the POR and based on country-wide

information," and that "[t]he World Bank provides information on the source and calculation of the rates it reports" and "about its local partners with whom it works to collect the necessary information for calculat[ing] its reported rates," the Department's determination that the World Bank data is the best available information on the record for valuing truck freight is supported by substantial evidence. *See* Remand Results at 17–18; *see also Since Hardware (Guangzhou) Co. v. United States*, 37 CIT ——, ——, 911 F.Supp.2d 1362, 1375 (2013) ("World Bank data represent a reputable source of information for valuing brokerage and handling because those data are prepared by an independent organization and are based upon a survey derived from a broad number of producers."); *Dongguan Sunrise Furniture Co. v. United States*, 36 CIT ——, ——, 865 F.Supp.2d 1216, 1246 (2012) ("Commerce has consistently found the World Bank to be a reliable source for data." (citation omitted)). Thus, this determination is sustained.

## B. Selection of the MALCO Data as the Basis for Financial Ratios

Rather than using the financial statements of aluminum producers Sudal Industries Limited ("Sudal"), Bhoruka Aluminium Limited ("Bhoruka"), and Gujarat

---

neys in [his] office when doing the electronic [indiscernible] selected, incorrectly selected the wrong period for that electronically." *See* Oral Arg. Tr. 32:5–32:7. According to the government's counsel, "when something's filed under the wrong segment, it doesn't necessarily get to the correct Commerce employees." Oral Arg. Tr. 33:11–33:12.

24. Tianjin's entire argument on this point in its brief before the court is as follows:

The [R]emand [R]esults presented to the Court are factually inaccurate. In the [R]emand [R]esults by the Department it is stated at page 2 that "[Tianjin] did not submit comments on the draft remand results."

This is untrue. [Tianjin] filed its comments on the [draft] remand results on May 13, 2013 under bar code 3135316. The Department failed to include such comments in the record it sent forward to the Court. To the extent the Department did not even consider [Tianjin's] comments on the draft remand, such remand must be rejected and returned to the Department for consideration of [Tianjin's] timely filed comments.

Tianjin's Br. 2 (citation omitted) (quoting Remand Results at 2). Remarkably, Tianjin's counsel failed to alert the court in its papers that it had misfiled its comments.

Foils Limited ("Gujarat") as it had done in the draft remand results, in the final Remand Results, the Department selected MALCO data as the basis for financial ratios. Remand Results at 2–3.

Tianjin, whose misfiled comments apparently supported the Department's use of the Sudal, Bhoruka, and Gujarat financial statements in the draft remand results, argues that it "was given no opportunity to address the Department's reasons for selecting [MALCO]" and that Commerce's selection of the MALCO data "cannot be sustained where a party was deprived of the opportunity to comment on the Department's determination and the facts and logic underlying such determination." Tianjin's Br. 2, 3 (citing Public App. to Tianjin's Br. 1–2). Tianjin alleges that MALCO received subsidies, that the MALCO data did not overlap the POR (i.e., that the MALCO data was non-contemporaneous with the POR), and "that the Department improperly rejected the [financial statements of the] [a]luminum producers used in the draft remand," i.e., those of Sudal, Bhoruka and Gujarat. Tianjin's Br. 2–3.

The Department responds that Tianjin cites no record evidence in support of its subsidies claim, that the contemporaneity issue was adequately addressed by Commerce in the Remand Results, and that, thus, Commerce's selection of the MALCO data is supported by substantial evidence. Def.'s Br. 21–22.

■ As to its reasons for selecting MALCO, the Department stated in the Remand Results [25] that it chose MALCO's financial statements because MALCO produces aluminum, which the Department had "previously determined to be a comparable product to pure magnesium." [26] Remand Results at 33. Commerce also noted that, when selecting a surrogate producer, "the Department examines how similar a proposed surrogate producer's production experience is to the [nonmarket economy] producer's production experience." Remand Results at 33. Like Company A, which produces pure magnesium, "MALCO produces only an unwrought metal product and does not produce downstream products." Remand Results at 33. "Because [Company A] manufactured primary pure magnesium instead of magnesium metal, [Commerce found] that relying on MALCO's financial statements [was] more appropriate in these [R]emand [R]esults than those of the three downstream aluminum producers [ (Sudal, Bhoruka, and Gujarat) ], even though their production experience is somewhat similar to [Company A's] production." Remand Results at 34.

25. Commerce first stated that, "when selecting financial statements for the purpose of calculating surrogate financial ratios, the Department's policy is to use data from market-economy surrogate companies based on the specificity, contemporaneity, and quality of the data." Remand Results at 32. Further, the "surrogate values for manufacturing overhead, general expenses, and profit ... will normally be based on publicly available information from companies that are in the surrogate country and that produce merchandise that is identical or comparable to the subject merchandise." Remand Results at 32–33 (citing 19 CFR 351.408(c)(4)). "[I]t is the Department's practice to, where appropriate, apply a three-prong test that considers the:

(1) physical characteristics; (2) end uses; and (3) production process" in determining what constitutes "comparable merchandise." Remand Results at 33 (internal quotation marks omitted).

26. The Department cites its determinations in a new shipper review of pure magnesium from the PRC for this proposition. Remand Results at 33 (citing Pure Magnesium From the PRC, 62 Fed.Reg. 55,215, 55,217 (Dep't of Commerce Oct. 23, 1997) (preliminary results of antidumping duty new shipper administrative review); Pure Magnesium From the PRC, 63 Fed.Reg. 3,085, 3,087 (Dep't of Commerce Jan. 21, 1998) (final results of antidumping duty new shipper administrative review)).

Commerce recognized in the 2008–2009 review that Sudal and Gujarat's production processes were similar to a "secondary production process" that "involved melting magnesium scrap and alloys in a smelter and then solidifying the mixture in molds to make magnesium metal ingots." Remand Results at 33. Company A, on the other hand, uses "a primary production process," which "begins by calcining dolomite with coal and then mixing calcined dolomite with chemical compounds (*i.e.,* ferrosilicon and fluorite powder) to create metal balls, which [are] placed into a reduction furnace to produce magnesium crown that will be further refined to remove impurities." Remand Results at 33–34. In other words, Company A's "finished product, pure magnesium, is unwrought metal while Sudal, Bhoruka, and Gujarat begin ·their production with an unwrought metal and finish with a wrought metal product[ ]." Remand Results at 34. Here, after "find[ing] that Sudal, Bhoruka, and Gujarat's production experience occurs at a different level of production from [Company A]," Commerce stated that, "[i]n comparison, MALCO produced primary aluminum, which the Department has previously found to be comparable to pure magnesium." Remand Results at 34.

Regarding contemporaneity, Commerce addressed the lack of overlap between the MALCO financial statements and the POR in the Remand Results. *See* Remand Results at 34 ("Although MALCO's 2006–2007 financial statements [were] an additional year removed from [Tianjin's] POR, [it] nevertheless [found] MALCO's financial statements to be most appropriate in this review because MALCO [was] the only candidate for surrogate financial statements on the record that employs the same production process as the one used by [Company A]."). In other words, although not contemporaneous with the POR, the MALCO .data was nonetheless the "best available information" because it was best approximated to Company A's production process.

As to its suggestion that MALCO received subsidies, Tianjin does not explain its reasoning or point to any evidence, let alone record evidence, that this is the case. *See* Tianjin's Br. 2 (arguing that, because "the Department gave no indication in its draft results that it was going to select [MALCO], absent either a time machine or access to the oracle at Delphi, [Tianjin] would have no way of commenting on such methodology and pointing out the many defects including the existence of subsidies for [MALCO]"). Moreover, neither has the court found any evidence on the record suggesting that MALCO received subsidies.

Because the Department chose the MALCO data as the basis for financial ratios after it had reviewed comments on the draft remand results, no party had an opportunity to comment on the selection during the administrative process. Tianjin is thus correct that it should be afforded an opportunity to dispute the choice. Moreover, because the Department changed its selection between the draft remand results and the final Remand Results, Tianjin cannot be faulted for not exhausting its administrative remedies. *See Jacobi Carbons,* 38 CIT at ——, 992 F.Supp.2d at 1367 ("Accordingly, because plaintiffs had no realistic opportunity to present their arguments before the Department, the court finds that plaintiffs did not fail to exhaust their administrative remedies."). ·

Tianjin is wrong, however, on where its argument should be made. That is, rather than seeking a remand, Tianjin's avenue was to make its arguments before the court in this appeal. *See Tianjin Magnesium Int'l Co. v. United States,* 35 CIT ——, ——, Slip Op. 11–17, at 8–9, 2011 WL 637623 (2011) ("Furthermore, the

Court of International Trade provides [Tianjin] a forum in which to challenge its AFA rate, regardless of exhaustion, in the event that Commerce unexpectedly changes its mind between the preliminary and final results." (citing *Qingdao Taifa Grp. Co. v. United States*, 33 CIT 1090, 1093, 637 F.Supp.2d 1231, 1236 (2009))); *Qingdao*, 33 CIT at 1093, 637 F.Supp.2d at 1236 ("A party, however, may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level." (citing *LTV Steel Co. v. United States*, 21 CIT 838, 868, 985 F.Supp. 95, 120 (1997))).

Tianjin had the opportunity to make a substantive case before the court in its comments following the Remand Results. Tianjin did not make substantive arguments here, however, and, to the extent it made cognizable objections, they are not sufficient to call the Department's determination into question. The record does not appear to contain evidence that MALCO received subsidies and the Department adequately explained, based on record evidence, why it chose the MALCO data even though it is not contemporaneous with the POR. Thus, because the court cannot find that the Department's determination was unsupported by substantial evidence, its selection of the MALCO financial statements is sustained.

## CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results of Redetermination are sustained. Judgment will be entered accordingly.